Good morning, ladies and gentlemen. We're here this morning to hear today's cases, and just for the record, I want everyone to know that Judge Rovner is here participating by video, so you'll see her as you approach the podium. So with that, I believe we're ready for our first case of this morning, Goodcat, LLC against David Cook. Mr. Bai. Mr. Bai Thank you, Your Honor, and may it please the Court. I'll start by addressing two elephants in the room, two critical issues that hang over this case. The first is this Court's recent decision in Legato v. Cook. With the utmost respect for this Court, we submit that that decision was improvident and must be revisited today pursuant to Circuit Rule 40E. The second issue stems directly from the first, and that is that there are issues of dispositive constitutional significance that are largely unaddressed in the argument and ensuing opinion in Legato. And in particular is this, is that the Indiana E-Liquid Act has no bearing on any out-of-state entities except for those who wish to do business in Indiana. I think much of your argument to that effect fails to recognize that one element, I'll under the Commerce Clause, forbids states from imposing extraterritorial regulations on other states. The whole notion of a national market under the Commerce Clause forbids that. And our panel opinion in Legato explains at considerable length why aspects of this Indiana law fail to measure up. Mr. Cook I understand, Your Honor. And respectfully, this case distinguishes from those line of cases where extraterritoriality was found in that there is a specific jurisdictional hook on every piece of the statute. Why does it make any difference to Indiana whether somebody is an employee or an independent contractor if they're doing the job for a company? I can't fathom why Indiana needs to reach into Florida or any other state and dictate such a detail. I cannot speculate as to the legislature's thinking in that regard, Your Honor. However, as I understand it, what the legislature was driving for here was the utmost independence with respect to security firms with whom these entities must contract. Well, I understand that, but actually I'm going to ask you to back up and explain to me why your clients, the intervening companies, have standing to appeal this injunction, which does not run against them and which is against only a party not before the court. Yes, Your Honor. I believe that there's no question and there's been no argument here that the appellants here, the licensees, are not injured. The only question here, I think, is whether the injury is redressable by a reversal here. No, but this is an— Well, go ahead, Judge Rovner. Well, I mean, the only injury would be a result of the potential competition that will result from GoodCat obtaining a permit and beginning to operate in Indiana. And as it is dependent on the subsequent actions by GoodCat, why is—why wouldn't this be a derivative injury? Well, Your Honor, I believe that even the cases cited by the appellees in this case, in particular Kendall Jackson, the court conceded that in exactly the same situation where competition would—that was increased as a result of the injunction. In that instance, there is injury. The only question left in that instance is redressability here. Well, but, you know, it reminds me of the line of antitrust cases where the competitive injury is that you're going to have more competition. Certainly. You know, which, of course, is not permissible under the antitrust laws. That's the Brunswick against Pueblo-Bolomat case. Your clients are unhappy that GoodCat is going to be in the mix and perhaps other companies if this Indiana statute is relaxed to the extent our panel and legato thought. But the main point I want to say is there's no injunction against you. There's nothing to set aside. And the Indiana authorities, for reasons best known to themselves, have not objected to the injunction against them. I understand, Your Honor. I can't speculate as to what—as to the attorney. I'm not asking you to. I'm just saying, why are you here? Because you are not subject to any command of the court. Certainly, Your Honor. However, I believe that that's not necessarily—excuse me, that that is not necessary under Article 3 standing. And this is a 1292A1 appeal, is it not? This is a preliminary injunction. Yes, Your Honor. So the case will continue. Your clients can say whatever they wish to say to the district court as it continues? I think, Your Honor, if the law is clear, even on the cases cited by GoodCat in this case, that there is standing here, as long as there is an injury to the permittees and that injury is redressable. That injury here is recognized. What our clients did was they scaled the barriers to entry into this market. Yes, of course, their injury is more competition. But there's nothing unlawful about that. There's been no antitrust allegation here at all. On four challenges to this law, there's been no allegation of any antitrust problem. Well, I mean, because this didn't come up until recently. But, I mean, instead you make what I think is a very weak argument that GoodCat itself has no standing. It seems to me GoodCat's standing is straightforward. But for these security provisions, they would continue to serve the Indiana market. They've complied in substance. It's not that they thumbed their nose at Indiana. They contracted with security firms. They put together all of the things Indiana law requires. It just wasn't being provided by mullhound and that seems like something well beyond Indiana's authority. Certainly, Your Honor. And if I may, even if this court finds that there is no standing for us, we submit that this is an issue of primary constitutional importance. It is not a contract. Well, if it's not, if you have no standing, then we have to dismiss the appeal for lack of a party with standing and in the fullness of time, the final judgment from the district court will come up. I understand, Your Honor, but I believe this is a constitutional issue that is too important to be missed. It has... No, no. There's no exception to the rules of standing for really, really important things. I understand, Your Honor. And if Your Honor is still unconvinced at the end of it, well, in any event, Your Honor, I believe on all of the cases here, there is injury absolutely to our clients and it is directly redressable in contrast with Hollingsworth, Cabral, and Kendall-Jackson. In that injunction here... If we dismiss the appeal as moot, is there any reason at all to even address the standing issue? I'm sorry, if you dismiss the appeal as moot, the instant appeal in this case, Your Honor? Right, as moot because legato resolves everything. Yeah, I understand, Your Honor. The only way that this case isn't moot is if one of two things happens, I'll admit. The first is if the state, the attorney general, seeks certiorari review from the Supreme Court and that review is granted. Right, because it's not seeking rehearing here. That time has passed. That's correct, Your Honor. The second way is what we submit the court should and must do in this instance, respectfully. And can I add that I can't find any case in which we have ever considered a decision of this court non-final just because somebody might file a petition for cert. I understand, Your Honor. There are no such cases. I understand, Your Honor. But I believe, and my research tells me that this court has exercised its liberal 40E review discretion, I believe seven or eight times in the last six months of last year, to revisit and in many cases overturn prior decisions of another panel. Circuit rule 40E allows this court to revisit any prior panel. No, we understand that. If that's your argument, then we'll take it and maybe you want to save a minute for rebuttal. Sure, Your Honor. May I address the constitutional issues? Sure. Sure. Your Honor, we- I mean, you're using your time, but that's fine. I understand. We must highlight respectfully the diversion from precedent that Legato makes. In Supreme Court, unanimously in Baldwin v. Selig, said that New York can regulate out-of-state dairy conditions and require compliance permits of those out-of-state businesses that want to do business in New York. The Ninth Circuit in Rocky Mountain Farmers v. Corey said that California can impose strict manufacturing standards on out-of-state refiners of petroleum on the condition of doing business in California. And the Second Circuit in National Electrical said that Vermont can require compliance with manufacturing and labeling conditions of any out-of-state manufacturers who want to sell in Vermont. What the Seventh Circuit missed here respectfully, with the utmost respect again, was that it focused on the rigorous of the regulation, not whether or not it was extraterritorial. No, it also said, you know, suppose another state decides it has to be an independent contractor because that's a more stable relationship. There you would have a conflict and it's impossible to both have all your employees be employees and all your employees be independent contractors at the same time. Yes, Your Honor. So there are many conflicts like this. Maybe they like one sink versus two for the kitchens. You know, there's a lot of potential conflict. Thank you, Your Honor. I'm glad you asked that because that is respectfully another case where this Court took a misstep. As has been made clear by cases like Exxon v. Maryland and National Electrical itself, three, sorry, Your Honor. Go ahead. Three things must be shown for inconsistency of regulations to be a problem. The fact that there is a threat of inconsistency is not sufficient. The states are the laboratories of democracy. The conflict first must be real and right. It must be right before us. The law that might threaten inconsistency must be on the books. There is no such law. Two, the laws in question must be genuinely mutually exclusive. And third, they must restrict the very methods of interstate commerce, the length of trucks, the length of train cars, et cetera. That is not the case here, and this case here departs from Supreme Court precedent in that regard. All right. I think I'm going to ask you to sit down so that I can give you a minute to rebut. Thank you, Your Honor. Mr. Heyer. Good morning, Your Honors, and may it please the Court, Eric Heyer on behalf of the Appellee GoodCat LLC. Your Honors, this Court should dismiss this appeal for lack of subject matter jurisdiction or alternatively affirm the district court's preliminary injunction order. As the Court already has hinted to Mr. Coffman, at this point, what is the status of GoodCat as to the permit and the ability to operate in Indiana? GoodCat at this point, Your Honor, part of the preliminary injunction order was specifically to order the ATC to issue a permit to GoodCat, which was necessary because of the private cause of action otherwise that the permittees would have against GoodCat. And so GoodCat, as of now, has a permit that was ordered by the district court, and its products are on the Indiana market. However, if that preliminary injunction were to be vacated, there is the possibility that that may no longer be the case. And that goes to a point that I want to raise specifically, and it goes to both mootness and it goes to Article III standing of the intervening appellants here. Even if this court were to order the district court to vacate the preliminary injunction, and especially in light of the Legato Vapors decision, there's a potentially intervening causation problem for Article III standing for the appellants here as well. And that is that the ATC may still decide to allow GoodCat to have the permit in light of the Legato Vapors decision. And so even there, apart from the redressability issue, there's a causation defect as well to their Article III standing. On the redressability issue particularly, and why this must be dismissed, is that at the end of the day, the appellants are not, as the court suggested, bound by the preliminary injunction order. Appellants have, and any harm that they suffer is derivative, the fact that they're subject to additional competition from GoodCat. It's not any direct harm from the preliminary injunction order. And now in their briefing, the appellants have attempted to rely on this narrow exclusion from Kendall Jackson Winery, the Judge Easterbrook talked about, where if they had somehow some statutory cause of action to compel the ATC to take some action, then perhaps they would fit in that narrow exception. That's not the case here. The Indiana equivalent to the federal APA does not give them standing. It's not a protectable interest to say that we're subject to increased competition. 42 U.S.C. 1983 also, there is no sort of property right associated with protection from additional competition, and so that doesn't provide a basis for them to compel the ATC to do anything. And so at the end of the day, I think this court must dismiss this appeal for lack of subject matter jurisdiction. There simply is no Article III standing. This is exactly like Kendall Jackson Winery and Cabral. Very briefly, I don't think there can really be any serious question about GoodCat's Article III standing to whether the Dormant Commerce Clause or otherwise to assert its claims. The last link in the causational chain of the threatened harm that GoodCat would have suffered, which is permanent exclusion from the Indiana market, was the denial of the permit by the ATC. And clearly, the denial of the permit was because GoodCat did not satisfy these security firm requirements. And there's only five narrow requirements that are at issue. Our challenge is actually much narrower than the challenge that was at issue in Legato Vapors. So what further proceedings do you anticipate once this phase is over, given that this is a preliminary injunction that we're reviewing? Right. Once Judge Barker and the Legato Vapors District Court judge, excuse me, enters the final judgment after the mandate issues, which I believe it's going to issue today out of this court, then I think at that point, GoodCat is clearly within the scope of out-of-state manufacturers that are subject to being beneficiaries of that judgment. I think that will effectively render GoodCat's underlying challenge moot unless there's some further... Is it moot or satisfied? I mean, I assume some motion goes before Judge Young. Right. Yeah, satisfied. What I anticipate, Your Honor, is hopefully some sort of agreed-upon judgment resolving our case. Right. Some sort of consent judgment. I don't think you mean mootness, which would deprive the district court of power to say anything. You're right. You're right, Your Honor. I think that at the end of the day, the state has to concede, and I think as Mr. By sort of already did, that at the end of the day, GoodCat is entitled to the ruling, regardless of the grounds, whether it's extraterritoriality or discrimination in effect under the Dormant Commerce Clause. So clearly the district court here did not abuse its discretion in entering the preliminary injunction in favor of GoodCat. Do you have a quick word to say about the cases that Mr. By was citing where other states have imposed, he asserts, extraterritorial manufacturing criteria? Yes, I mean, that extraterritoriality is purely an issue from the Lugato Vapors case, Your Honor. And Judge Manning specifically put the question to counsel for both sides, what's the best case that you have? And as a court, as Judge Hamilton said in the opinion, in 200 years of precedent out there from the U.S. Supreme Court and the courts of appeal, there is no instance of a state attempting to reach beyond its borders and regulate the manufacturing process of out-of-state entities as opposed to labeling. That's like the Vermont light bulb case. That's a labeling issue. It's a very different issue. Judge Manning, I loved his hypothetical, he said, that's like Indiana telling Ohio, here's the type of padlock you must put on your barn doors before we're going to let your milk into the state. And I think that's exactly right. I think that's exactly what the situation is here. I think the Lugato Vapors panel thoroughly evaluated and looked at all of those cases and correctly resolved that case. Here, the statistics really tell the story. 177 e-liquid manufacturers or brands prior to the effective date of July 1st of 2016, afterwards we have six permittees of which only four are operative. Four are located within the state of Indiana. One is literally just over the border in Cleves, Ohio, and the other one is in Florida. But the 75% owner of that Florida entity is a resident of Indianapolis. GoodCat went through all the procedures, tried to jump through all the hoops that were put before it, and was rejected by Mohawks. And at the end of the day, this is a case about the state outsourcing discrimination to a private entity. And the state can't hide behind the fact that there's a private entity out there. I think the I.V.B. Williams case out of the Fifth Circuit makes that elusively clear. And if we look at the statistics, 90% of the revenue from branded e-liquids came from those manufactured outside of Indiana before the effective date of this act. Had the district court not given the preliminary injunction to GoodCat, clearly that would have been reversed. We don't know the exact figures, and there's no way we can at this stage because no discovery has been entered into. So there's no evidence in this record about how big a problem adulterated vaping fluid is? Actually, there is, Your Honor. The state has stipulated, and the stipulation is the same one as in Legato Vapors, that the state has no evidence of there ever having been any contamination or sabotage of e-liquids in the manufacturing process. And they don't take a position, I think that's one of the factual stipulations on how possible or probable that could be. Now, and this goes back again to the issue of Article III standing. Interveners say, well, that's the state's stipulation. We're not bound by that. Well, that's the exact reason why we can't be here and hear these sorts of appeals without the state being present. They can't cherry pick and take the good and leave the bad. GoodCat was also not required to prove, in order for elevated scrutiny under the Dormant Commerce Clause to apply, that this was a complete, 100% airtight embargo. And I think Hunphy Washington Apple Advertising Commission makes that clear. There you had a circumstance where the North Carolina regulatory scheme sort of unfairly leveled the playing field for Washington Apple producers, because they had a very well-accepted and highly detailed level of classification of their products, and North Carolina effectively said, you can't use it if you're going to sell apples in our state. You have to use the federal one. And the Supreme Court said, we're going to apply elevated scrutiny, despite the fact that there are still probably Washington apples coming into North Carolina, because it strips the Washington apple manufacturers of their competitive advantage that they have from their system. And I think this Court's decision in Government Suppliers Consolidated Services v. Buy also suggests the same thing. It said the practical effect of the backhaul ban, this is one of the waste cases, would be to reduce very significantly, but implicitly saying, not necessarily totally eliminate the inflow of out-of-state waste into the state of Indiana. So the District Court, and I think the District Court ultimately said this case sort of falls somewhere on the continuum between pipe balancing and strict scrutiny. I would submit that it's properly within the strict scrutiny bucket, but even if it's not, there's not an issue under pipe balancing, given what we have here in terms of the statistics of who the players were in the Indiana e-liquid manufacturing market before and after the effective date of the Act. There's been argument here that rational basis is the proper test to apply, it clearly is not here. That only applies when there's absolutely no reallocation of market share among participants from various jurisdictions in the state and out-of-state, and there's no competitive advantage for local firms versus out-of-state firms. Clearly here there is for nothing more than the geographic proximity. And at the end of the day, if we look at the W-2, as Your Honor suggested, the W-2 employees versus independent contractor distinction, or whether the security firm has a manufacturing facility for doors, it really gives no further assurances of safety for the e-liquid. So thank you. Thank you. I see my time is up. Thank you, Your Honor. Your time is up. Thank you very much. Mr. By. Thank you, Your Honor. With respect to esteemed counsel, he's wrong and directly wrong on one thing, and that is that there has never been an instance where a state has reached beyond its borders to regulate manufacturing practices for those who wish to access the home state's market.  v. Corey. And there the court did ask the state there, what's your best case? And that was their reply. And respectfully, Your Honor, we don't see any of that discussion in this court's opinion. And I think it's important that the court address how this case is going to be distinct from that one, because extraterritoriality is not a dimmer switch. It's not a sliding scale. It's an on and off switch. The statute either regulates transactions wholly beyond its borders, and the switch is on, or it doesn't, and the switch is off. And in that instance, the statute, excuse me, only needs to pass rational basic scrutiny in there and only there can the court ask the question of, did Indiana go too far? And respectfully, Your Honor, I think the biggest problem that could be crystallized in the court's concluding paragraph, where it said that Indiana's regulations are akin to an attempt by Ohio to regulate not just milk labeling, but also the heating, cooling, and other conditions for out-of-state barns where the cows are milked. And it is this exact law, this exact hypothetical law, that was endorsed by a unanimous Supreme Court with Justice Cardozo writing in Baldwin v. Selig. In that case, the court said what the state of New York should do if it wants Vermont producers to get access to its retail market is, if it wants to care for the cattle, impose regulations on the dairy farmers and how they treat the cows. Okay. So I think we have your argument, so thank you very much. Thank you, Your Honor. And the court will take the case under advisement. Thank you.